IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

———————————————————————————

UNITED STATES OF AMERICA,

        v.                                        23-CR-60-JLS-MJR

PETER GERACE, JR.,

                Defendant.

———————————————————————————

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S OMNIBUS MOTION

The United States of America, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, Evan K. Glaberson, Assistant United States Attorney, of counsel, hereby files a response in opposition to defendant's motion to adjourn (*see* Docket No. 65).

## BACKGROUND

The defendant, Peter Gerace, Jr., was charged by Indictment on June 8, 2023, with four counts of wire fraud.  Dkt. 1.  The wire fraud charges in the indictment were tied to the electronic submission of false, fraudulent and fictitious documents seeking loan money from the SBA under the "EIDL" disaster loan program on April 5, 2020, June 12, 2020, August 7, 2021, and on December 19, 2021.  Among the false statements the defendant certified in these documents seeking disaster assistance loans were false certifications that the defendant's business, PGC, did not present live performances of a prurient sexual nature and that the defendant had not previously been convicted of a felony.  *See* Dkt. 1, Indictment ¶ ¶ 14 – 16, 25.

On July 17, 2023, the government produced voluntary discovery materials, which included the following materials:

| | | |
|---|---|---|
| GOV-00000001 | GOV-00000001 | Jail Call |
| GOV-00000002 | GOV-00000004 | Gerace_Affidavit |
| GOV-00000005 | GOV-00000020 | Gerace_Plea_Agreement |
| GOV-00000021 | GOV-00000033 | Gerace_PPP_Application |
| GOV-00000034 | GOV-00000117 | 3302532348 Pharaoh's GC |
| GOV-00000118 | GOV-00000128 | 3302532348-Additional Emails |
| GOV-00000129 | GOV-00000334 | 3302532348Mod 1 Pharaoh's GC |
| GOV-00000335 | GOV-00000336 | Loan Payments |

The government produced documents from 20-CV-665, a lawsuit initiated in June 2020 by the defendant after being repeatedly rejected for "PPP" disaster assistance loans by the SBA because PGC presented live performances of a prurient sexual nature which disqualified him from receipt of disaster assistance loans. Gerace personally swore and affirmed, as part of an affidavit in that lawsuit, that he was aware that he had been rejected for PPP loans by 3 separate entities because PGC presented live performances of a prurient sexual nature.[1] Despite the repeated loan rejections, and despite the numerous judicial opinions upholding the validity of SBA denying loans to business of a prurient sexual nature, the defendant continued to submit loan application and modification documents in which he certified as true the false statements that PGC did not present live performances of a prurient sexual nature, and continued to certify other false statements as true, which included that defendant had never been convicted of a felony. Ultimately, the defendant's false statements induced the SBA to approve an increase of defendant's EIDL disaster loan from $500,000 to $2,000,000 on December 19, 2021.[2]

---

[1] The validity of these loan denials based on the "prurient nature" of the defendant's business was upheld by the District Court, in denying defendant's motion for a preliminary injunction on June 26, 2020 (20-CV-665, ECF. No. 18) and later by the Second Circuit Court of Appeals on May 19, 2021 (20-CV-665, ECF. No. 30).

[2] Defendant was charged by indictment with sex and drug trafficking offenses connected to his ownership and control of PGC on February 25, 2021 in Docket 19-cr-227. Defendant failed to advise the SBA of this indictment as part of any documents filed in support of his loan modification requests after February 2021.

On March 25, 2025, the government provided additional disclosures to defendant which included the following documents from *United States v. Carter Lucas*, 23-CR-405 (District of Utah):

1) 23-cr-405 – Gov Motion for leave to dismiss

2) 23-cr-405 – Gov Supplement to Motion in Limine regarding updates to EIDL criminal history questions

3) Memorandum of Interview – 11/25/2024 with SBA employee

4) Memorandum of Interview – 12/5/2024 with SBA Director COVID EIDL Servicing Center

5) Memorandum of activity correcting 12/5 MOI

The *Lucas* documents related solely to a dispute over materiality in that particular case where the defendant falsely certified loan application documents in which he falsely claimed to have no criminal convictions.  Under those circumstances, the SBA provided conflicting information during pre-trial preparation meetings indicating that it was possible the loan would have eventually been approved, after heightened scrutiny, even if the defendant had answered the criminal history questions truthfully.  The *Lucas* case did not include false statements about business presenting live performances of a prurient sexual nature, or allegations of a series of lies woven together to induce the issuance of an EIDL loan and subsequent loan modifications raising the amount loaned to $2,000,000.


The Court initially ordered the defendant file any pre-trial motions by November 13, 2023.  (*See* Dkt. No. 6, Scheduling Order 1).  On November 22, 2023, the Court granted defendant's request for an extension of time and ordered that any pre-trial motions be filed by January 16, 2024.  (*See* Dkt. No. 26, Scheduling Order 2).  On January 16, 2024, the defendant

moved again to extend the scheduling order and for an extension of time within which to file pre-trial motions, the government opposed. (*See* Dkt. No. 27, Defense Motion to Adjourn). On February 8, 2024, the Court ordered that this matter, including any pre-trial motion practice, would be held in abeyance pending the resolution of other indictments charging the defendant. (*See* Dkt. No. 31, Minute Entry February 8, 2024). On December 18, 2024, the parties appeared before the Court, accepted the defendant's waiver of any attorney-client conflict, and ordered that all time through February 3, 2025, was excluded for the purpose of the Speedy Trial Act. (*See* Dkt. No. 56, Minute Entry December 18, 2024). On the same date, the Court issued a Second Amended Scheduling Order directing defense motions be filed by February 3, 2025. (*See* Dkt. No. 57, Scheduling Order 3). On February 3, 2025, and again on April 7, 2025, the defendant moved for additional extensions of time within which to file pre-trial motions. (*See* Dkt. Nos. 59, 62). The Court issued a Third Amended and Fourth Amended Scheduling Order, resulting in a motions deadline of May 12, 2025. (*See* Dkt. Nos. 61, 62).

On May 12, 2025, the defendant filed motions to (1) transfer the trial of this matter to Rochester, (2) mandate certain disclosures, (3) to make additional motions, and (4) for other relief the Court deems proper. The government opposes each of defendant's motions, and this response ensues.

## ARGUMENT

**1. The Court Should Deny the Defendants' Motion for Change of Vicinage.**

There is an old saying that "he who seeks equity must present himself in court with clean hands." *Manhattan Med. Co. v. Wood*, 108 U.S. 218, 225 (1883). And, so, it is ironic that Mr. Gerace, who has provided multiple post-conviction interviews to the news media, now

seeks equitable relief through an intradistrict transfer to Rochester due to news coverage of his cases. *See* Dkt. 65-1 at § II. Mr. Gerace's contribution to the problem he now complains of is reason enough to deny his latest attempt at judge shopping. But if that were not enough, two other bases stand out: the Magistrate Court should not be weighing in on where the trial occurs and, even if it did, the District Court's logic in denying the government's motion for an intra-district transfer in Case Nos. 19-CR-227 and 23-CR-37 applies here, too.

### A.    Legal Framework

"Unless a statute or these rules permit otherwise, the government must prosecute an offense in the district where the offense was committed. The court must set the place *within* the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." FED. R. CRIM. P. 18 (emphasis added). Likewise, Local Rule 7 provides:

> Upon filing of the indictment or information, each criminal case is assigned to a Judge in either Buffalo (typically, cases arising in Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans and Wyoming counties), or Rochester (typically, cases arising in Chemung, Livingston, Monroe, Ontario, Schuyler, Seneca, Steuben, Wayne and Yates counties). The assignment within these areas shall ordinarily be by random selection. *The Court may transfer cases within the District, sua sponte.* Parties requesting transfer of a case from Buffalo to Rochester, or vice versa, shall file a written motion requesting such relief, returnable before the Judge to whom the case is originally assigned.

W.D.N.Y. LOCAL R. CRIM. P. 7 (first emphasis added).

Under these provisions, not only may the Court transfer this case to another division within the district, but it may do so either *sua sponte* or upon a party's motion.

However, before doing so, the Court must consider the Rule 18 factors of "regard for

the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice". *See* FED. R. CRIM. P. 18, Advisory Committee Notes to 1966 amendment (collecting cases); *United States v. Florence*, 456 F.2d 46, 50 (4th Cir. 1972) ("Of course, present Rule 18 permits a transfer within the district for the convenience of the defendant and the witnesses." (internal quotations omitted)). None of these four factors is weightier than the others, and the court wields "substantial discretion to balance any competing interests." FED. R. CRIM. P. 18.

### B. Application

The defendants' motion fails for two reasons. First, the Magistrate Court should not be deciding whether this case should be tried in Rochester even if such determinations do not "dispose of a charge or defense." FED. R. CRIM. P. 59(a). Of the cases in this circuit referencing the terms "intradistrict transfer," none were decided by a Magistrate Court. *See, e.g.*, *United States v.* Jenkins, No. 19-2778-CR, 2022 WL 3138879, at *6 (2d Cir. Aug. 5, 2022) (affirming Chief Judge Wolford's denial of an intra-district transfer motion); *Brennan v. Straub*, No. 02 CIV. 7655(RWS), 2003 WL 21313841, at *1 (S.D.N.Y. June 9, 2003); *Tucker v. Am. Int'l Grp., Inc.*, 728 F. Supp. 2d 114, 116 (D. Conn. 2010); *Rossi v. Ferring Pharms.*, No. 3:15-CV-01367 (VLB), 2016 WL 593440, at *1 (D. Conn. Feb. 12, 2016); *Havas Worldwide New York, Inc. v. Lionsgate Ent. Inc.*, No. 15-CV-5018 KBF, 2015 WL 5710984, at *1 (S.D.N.Y. Sept. 29, 2015); *Moore v. Allentown Vill. Soc., Inc.*, 2013 WL 4008740, at *2 (W.D.N.Y. Aug. 5, 2013); *United States v. Prado*, No. 10-CR-74 JFB, 2011 WL 3472509, at *17 (E.D.N.Y. Aug. 5, 2011); *Est. of Meimaris v. Royce*, No. 18CIV4363GBDBCM, 2018 WL 4360776, at *3 (S.D.N.Y. Aug. 22, 2018); *Longsworth v. Cnty. Nassau*, No. 17-CV-6787(KAM)(ARL), 2019 WL 8587289, at *3 (E.D.N.Y. July 16, 2019); *United States v. Livoti*, 8 F. Supp. 2d 246, 248 (S.D.N.Y. 1998). That

6

district courts have taken the reigns to resolve questions about either the propriety of a particular venue or their sitting on a case reflects the common sense and fundamental principle that one judge ought not abrogate another's judge's "duty to sit." *In re Martin-Trigona*, 573 F. Supp. 1237, 1243 (D. Conn. 1983). And this principle applies with particular force where, as here, the government faces a "contrary to law and clearly erroneous" standard of review under an abuse of discretion standard should it appeal any order that either moves the case from Buffalo or effectively disqualifies Judge Sinatra. *See* FED. R. CRIM. P. 59(a).

Nor does the "administration of justice" require a transfer. FED. R. CRIM. P. 18. To this end, the defendant claims that pre-trial publicity in this case has extensively prejudiced the jury pool. *See* Dkt. 65-1, at § II, ¶ 34. The government understands this concern: in 19-CR-227 and 23-CR-37, the government cited the amount of media coverage for the *Bongiovanni* and *Gerace* trials, as well as significant witness tampering concerns, as a basis for transferring the case to the Rochester division. *See* Oral Arg. Tran., at 61–62, (dated Oct. 31, 2023), *United States v. Bongiovanni*, 19-CR-227/23-CR-37. In opposition to the government's motion, and with respect to the pre-trial publicity those cases attracted, counsel for Mr. Gerace argued:

> Mr. Foti:      And news coverage is part of that consideration, but news coverage and the impact that that potentially has, and obviously we have to speculate to – to come to some sort of determination as to what we think that would be, but to the extent that news coverage could have an impact on this, there are ways to remedy that that are not as extreme as moving and relocating the trial.
>
> The Court:      So are you telling me you think Mr. Gerace is going to get a fairer trial in Buffalo than in Rochester?
>
> Mr. Foti:      I think that with proper *voir dire* and proper steps taken through that process, I think that yes, the fairness can be resolved through the proper handling of jury selection.
>
> The Court:      Okay.

| Mr. Foti: | If that's not the case, *obviously we would have to revisit it*.  But at this point, I think that those issues can be addressed through proper *voir dire*, through jury questionnaires, which is something that's going to be discussed by this Court. |
|---|---|
| The Court: | Yep. |

*Id.* at 66–67 (emphases added).

In response, the government urged the Court to move to trial to Rochester, so the defendants could have a "jury pool that knows almost nothing about the history and subcultures of Buffalo that animate the undercurrents of this case" and, instead, "listen to only evidence in this courtroom."  *Id.* at 73.

The Court disagreed, noting that the government's argument "[d]id not resonate with [it] at all."  *Id.*  In denying the government's motion, the Court held:

> So, I'm going to deny the government's motion to change venue.  We're [g]oing to try it here.  Obviously, we're going to start *voir dire* and things may change, and *we may have to do something then*, but we're gonna — for the time being I'm going to deny the government's motion to transfer venue to Rochester.  I don't want to be the first Court in the country to do this, and I think the defendants have convinced me that on balance this is the better venue right now.  And we're going to keep it here, obviously, *without prejudice to* the government or *the defense moving to change venue once we start the jury-selection process*.

*Id.* (emphases added).

Consistent with the Court's point, other courts have recognized that it is the "extreme case," where the "trial atmosphere . . . was utterly corrupted by press coverage," that transfer is appropriate.  *Skilling v. United States*, 561 U.S. 358, 380–81 (2010); *see United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010) (noting that cases where adverse pretrial publicity warrants a

presumption of prejudice "are very rare . . . and have been characterized . . . as 'extreme situation[s]'" (quoting *United States v. Campa*, 459 F.3d 1121, 1143 (11th Cir. 2006) (en banc))). In most cases, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976); *accord United States v. Escobar*, No. 21-CR-101(JFB), 2024 WL 4802676, at *3 (E.D.N.Y. Nov. 15, 2024) (same).

Moreover, despite the Court's express invitation, at no point—not after the government moved to disqualify one of Mr. Gerace's attorneys in 19-CR-227/23-CR-37, nor after the Grand Jury returned the Second Superseding Indictment in Case No. 23-CR-99, nor following Bongiovanni's convictions in his second trial—did Mr. Gerace's defense team move to transfer Mr. Gerace's case to Rochester. *But see* Dkt. 23-CR-99, ECF No. 410, Gerace Mot., at 104–05 (arguing that Mr. Gerace's opposition to the government's motion for an intra-district transfer preceded the government's motion to disqualify counsel, the Second Superseding Indictment in this case, and the guilty verdicts in Mr. Bongiovanni's trials, and implying that he would have done so if those things had occurred).

Instead, the case proceeded to trial, where the defense team moved to strike virtually every member of the venire—using lengthy questionnaires and quasi-private *voir dire*—who had heard of either Mr. Gerace, Mr. Bongiovanni, or this case through the news media, family, or friends. The District Court granted their motions, often over the government's objection. In doing so, the District Court presciently and efficiently empaneled a *tabula rosa* jury that the government's transfer motion had sought to create through more drastic and, according to the defense, taxing means. In other words, the actual experience of *voir dire* during Mr. Gerace's

trial in 19-CR-227/23-CR-37 validates the District Court's decision to conduct the trial in Buffalo.

Armed with the knowledge that the Court's diligence ensured a fair jury, unaffected by media coverage, the government firmly opposes the defendants' request to transfer the case to Rochester and for administrative reassignment of the case to a different judge in Rochester. Simply, there is no reason why the parties cannot employ a similarly thorough questionnaire and *voir dire* process to eliminate jurors tainted by media exposure. And the Western District of New York is particularly well-suited for this process because, as the government and Mr. Gerace's defense team witnessed, the jury venire draws from dozens of towns and villages outside of Buffalo that have minimal exposure to Buffalo-based news media. *See* JURY PLAN, U.S. DIST. CT., W. DIST. N.Y., at 1, (dated Mar. 2025) (noting that the Buffalo Division draws from Erie, Genesee, Niagara, Orleans, Wyoming, Chautauqua, Cattaraugus, and Allegany counties).

None of the cases the defendant cites support a contrary conclusion. For example, in *United States v. Wittig*, the district court approved an intra-district transfer for a re-trial of the defendants in pertinent part due to a Topeka Capital-Journal editorial urging the government to re-try the owners. No. 03-40142-JAR, 2005 WL 758605, at *4 (D. Kan. Apr. 4, 2005). In the court's view, "[b]y transferring th[e] case to the Kansas City division, any prejudice or bias attributable to the editorials appearing in the [newspaper] can be avoided." *Id.* Here, the defendants do not complain about any newspaper editorials and, even if they did, the one editorial that the government is aware of (i) related to Mr. Gerace's prior conviction, (ii) was published in a radically different media environment than existed in 2005 when *Wittig* was

decided, (iii) is accessible only to paid subscribers of The Buffalo News, and (iv) will have preceded any trial in this case by over a year.

*United States v. Addonizio* is similarly inapposite.  *See* 451 F.2d 49 (3d Cir. 1971).  There, the government indicted Addonizio, the Mayor of Newark, New Jersey, members of the city government, various contractors for Hobbs Act extortion.  *Id.* at 54.  A substantial amount of pre-trial publicity "concentrated largely in the areas around Newark" surrounded the prosecution.  *Id.* at 60.  Though the district court denied the defendants' motion for change of venue under Rule 21, it transferred the proceedings from Newark to Trenton, over the defendants' objections, after specifically finding that "such a transfer will not unduly burden or inconvenience either the defendants or the witnesses."  *Id.*    Here, (i) none of the defendants are public figures, (ii) the charges do not implicate the integrity of local government, (iii) the media environment is, again, radically different than it was in 1971, and (iv) there is no indication that the trial court had prior recent experience in conducting a successful *voir dire* to filter out jurors prejudiced by media exposure.

Moreover, both *Wittig* and *Addonizio* share an important feature that this case lacks: in neither of those cases did the defendants contribute to the pre-trial publicity that purportedly problematized their ability to procure a fair and impartial jury.  The same cannot be said here. From the outset of his prosecutions, either Mr. Gerace's attorneys or Mr. Gerace, himself, have fed the media's interest in his cases.

With respect to Mr. Gerace's former counsel, examples of comments made to the press include:

1.  "Cohen lambasted Gerace's ex-wife, Katrina Nigro, and Assistant U.S. Attorney Joseph Tripi, the lead prosecutor in the ongoing federal investigation into organized crime. 'A disgruntled and disturbed ex-wife has been casting aspersions against some very fine people, and Judge Michalski is one in a long list who have been victimized by her,' Cohen said." *See*, Michel, Lou & Herbeck, Dan, The Buffalo News, Mar. 24, 2022, <https://buffalonews.com/news/local/crime-and-courts/feds-search-home-of-state-supreme-court-justice-john-michalski-who-was-hit-by-train/article_566a67f2-ab82-11ec-8254-ab64dd8b3b22.html>

2.  "It's unfortunate that anyone would believe a word Ms. Nigro says. We know her history. Telling tales is nothing new to her." *See,* Brown, Steve & O'Rourke, Joseph, 2WGRZ News Publication, May 4, 2021, <https://www.wgrz.com/article/news/investigations/the-judge-the-strip-club-owner-and-the-ex-wife/71-c5c6b9d3-87ba-43ee-9adf-d3c23d176e75>

3.  "Steven M. Cohen, an attorney for Peter Gerace, has raised questions about her credibility in a lawsuit accusing her of libeling and slandering Peter Gerace." *See,* Herbeck, Dan, The Buffalo News, Aug. 29, 2021, <https://buffalonews.com/news/local/crime-and-courts/witness-in-organized-crime-probe-sent-to-jail-for-six-months-for-vehicular-assault/article_5d54c7b8-0116-11ec-9278-1b9ba7fdc3c1.html>

4.  "A disgruntled and disturbed ex-wife has been casting aspersions against some very fine people, and Judge Michalski is one in a long list who have been victimized by her," Cohen said. … "Regrettably, a naive assistant U.S. attorney has swallowed everything this woman says hook, line and sinker." *See*, Herbeck, Dan, The Buffalo News, Mar. 22, 2022, https://buffalonews.com/news/local/crime-and-courts/feds-search-home-of-state-supreme-court-justice-john-michalski-who-was-hit-by-train/article_566a67f2-ab82-11ec-8254-ab64dd8b3b22.html>

5.  "I have no evidence of a crime committed by Mr. Gerace. I don't have the names of a single witness. I am befuddled," Cohen said.https://buffalonews.com/news/local/trial-date-set-for-strip-club-owner-ex-dea-agent-in-organized-crime-case/article_430b4fe8-70ec-11ed-b0d4-bb0f6d5eb35b.html> 6 *See*, Michel, Lou, The Buffalo News, Nov. 22, 2022, <

6.  "My client still is terribly disadvantaged. I don't know the name of a single witness, a single victim, a single transaction for which my client has been indicted. That is ludicrous," he said. "Mr. Tripi continues to say my client is a danger. He hasn't been able to point to a single instance where my client has threatened anyone directly or indirectly," Cohen said.7 *See*, McAndrew, Mike, The Buffalo News, Jan. 11, 2023, <https://buffalonews.com/news/local/crime-and-courts/prosecutors-

can-keep-witnesses-secret-for-now-in-bribery-case-tied-to-organized-crime/article_54189566-90f9-11ed-9fa9-5f078216dfae.html>

7.  Steven M. Cohen, said it is his understanding that all four of the charges involved one witness "who I am very much looking forward to cross-examining under oath." "We are not at all surprised that the U.S. Attorney is attempting to bring additional charges now. It has become apparent that there's no direct evidence against Peter" that he is facing in June in court, Cohen said Saturday." *See*, Becker, Maki, The Buffalo News, Mar. 25, 2023, <https://buffalonews.com/news/local/crime-and-courts/peter-gerace-jr-witness-tampering-human-trafficking-organized-crime/article_5ff462e6-cb43-11ed-a878-63084e90f921.html>

8.  "There is no way this jury is going to be able to unhear the term Italian organized crime," Cohen said. "They're not going to unhear the term mafia. And they're also not going to be able to unhear the fact that Peter does have relatives who were involved in that. Peter himself was never involved in Italian organized crime. But he has relatives who likely were." […] When the judge tells jurors to disregard something that they have heard or seen in court, it rarely affects the jurors like it is intended, Cohen said. Curative instructions "fall far short of what's in the best interest of our client," he said. *See*, Lakamp, Patrick, The Buffalo News, May 5, 2023, <https://buffalonews.com/news/local/crime-and-courts/ex-dea-agent-strip-club-owner-should-be-tried-together-judge-says/article_d2592222-e9ed-11ed-aec6-e7ad940a8f3e.html>

9.  "The government is doing everything in its power to prevent Gerace's defense from preparing our client for trial," he said. **"**Regrettably, they have found a sympathetic judge who has ordered all these restrictions." *See* Lakamp, Patrick and Michel, Lou, The Buffalo News, May 31, 2023, < https://buffalonews.com/news/local/judge-refuses-to-suppress-evidence-from-searches-of-geraces-home-and-strip-club/article_eeee9966-ff1a-11ed-8610-6fccddc702b4.html>    (emphasis added)

10. "This judge continues to be particularly harsh to Mr. Gerace, and we see no legitimate basis for that," said Steven M. Cohen, who with attorneys Eric M. Soehnlein and Joseph M. LaTona, represents Gerace. "He appears to accept whatever the prosecution says at face value, even though they are bare allegations not supported by evidence." (Emphasis added.) *See*, Lakamp, Patrick, The Buffalo News, June 6, 2023, <https://buffalonews.com/news/local/judge-refuses-to-release-strip-club-owner-ahead-of-bribery-sex--and-drug-trafficking/article_3fd18366-0475-11ee-a8d3-5fb60c07e3c4.html>

11. "The assistant United States attorney continues to make allegations and propound innuendo, no evidence," Cohen said. "We look forward to a

trial before impartial jurors so that our client can be acquitted and finally move beyond these baseless allegations." "There seems to be no depths to which he will not plunge to attack Mr. Gerace," Cohen said. *See*, Lakamp, Patrick and Michel, Lou, The Buffalo News, June 11, 2023, <https://buffalonews.com/news/local/crime-and-courts/prosecutor-calls-late-judge-michalski-unindicted-co-conspirator-in-gerace-sex-trafficking-case/article_732e1112-0573-11ee-bf9d-ebe59a91d8da.html>

12.    "This is not a case where they have any evidence," Cohen said of the government, even after all of the executed search warrants. "There's nothing going to be on the table. You know, here are the handcuffs that were used to chain the girls to the wall. Doesn't exist. Here's a picture of the container that the girls were shipped off to Shanghai. Doesn't exist. Here are the drugs that were caught or bought on premises. Doesn't exist. So this is all about character." *See*, Lakamp, Patrick, The Buffalo News, June 21, 2023, <https://buffalonews.com/news/local/crime-and-courts/judge-recuses-himself-from-strip-club-owner-case-after-voicing-suspicion-of-legal-gamesmanship/article_b3bd89ee-103e-11ee-82da-53ded94b7e1b.html>

Indeed, as the government noted in its motion for an intra-district transfer in 19-CR-227/23-CR-37, Mr. Gerace's prior counsel advertised his ability to "successfully use[] media to garner public support for clients." *See* Mot. for Intra-District Trans., at 9 & n. 4.

Mr. Gerace has also, in his personal capacity, generated the media publicity that he now complains of. In the run up to his trial in 19-CR-227/23-CR-37, Mr. Gerace wrote letters to the news media complaining about the government's counsel and U.S. District Court Judge John L. Sinatra. Those complaints resulted in at least one evening news broadcast. More recently, Mr. Gerace has sought to re-litigate his convictions in those cases by giving multiple interviews with televised and print media. Remarkably, Mr. Gerace has complained about an interview a juror in his trial gave to WGRZ while *omitting* that the juror agreed to be interviewed only after Mr. Gerace, himself, participated in a telephonic interview complaining about the trial that was broadcasted in the evening news. *See* DAVID MCKINLEY, *Juror 10 speaks*

14

*about Peter Gerace trial*, WGRZ, (dated Mar. 31, 2025). What's more, defendant Gerace appears intent on continuing to speak to the media while his requests for intradistrict transfers in multiple cases due to pre-trial publicity remain pending.

Mr. Gerace's conduct offends a central maxim in the American legal system: that he who comes to court with unclean hands cannot ask the Court to wash away the wrongs he has sewn. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945) ("This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. . . . Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor."). It is unfathomable that a defendant who personally and through his agents contributed heavily to the media coverage of his cases can then, based on such coverage, invoke this Court's equitable powers to transfer his trial to a different division. *Accord United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990) (noting that one factor in determining whether to transfer venue under Rule 21 is which party has generated the media coverage).

An intradistrict transfer would also inconvenience the District Court and the District Court's staff. While the government does not believe the Court's convenience should factor prominently in its application of the Rule 18 factors, it remains a consideration as part of a holistic analysis of the Rule 18 factors. Notably, unlike motions filed in defendant's other cases, the defendant does not appear to have endorsed the possibility of obtaining a new district judge by transferring the case to Rochester. Rather, the defendant's motion is styled solely with reference to change of " Vicenage," which the Supreme Court recognizes is different from the "…Venue Clause in two ways: it concerns jury composition, not the place where a trial may

be held, and it narrows the place where the trial is permissible by specifying that a jury must be drawn from 'the State *and district* wherein the crime shall have been committed.'" *Smith v. United States*, 599 U.S. 236, 245 (2023).    The defendant's instant motion does not seek to attempt to remove the presiding District Judge from the present case.

The motion for an intradistrict transfer should be denied for all the reasons stated herein.

### 2. The Court Should Deny the Defendants' Motions for Disclosure Under Rule 16, For Jencks Material and Pursuant to Brady

The defendant has acknowledged that the government has provided discovery in this matter but has filed motions for disclosure to "preserve the defendant's discovery rights and compel materials that have not yet been produced or made available."  The defendant's motions for disclosure should be denied as moot, denied as pre-mature or denied as lacking merit.  The government has complied with its discovery obligations, will continue to comply with its ongoing responsibilities and with any future pre-trial order(s) dealing with Jencks Material.

### A.    Legal Framework

"[P]re-trial discovery in criminal cases is strictly circumscribed." *Nelson*, 606 F. Supp. at 1389.  "Although Rule 16(a) [of the Federal Rules of Criminal Procedure] provides a mechanism for liberal discovery, it was not intended to provide the defendant with access to the entirety of the government's case against him."  *Percevault*, 490 F.2d at 130.  The government has complied with its obligations in this case by providing voluntary discovery.

Rule 16 requires the government, at the defendant's request, to produce the defendant's statements and criminal record, as well as certain documents, objects, reports and expert summaries. Rule 16 does not entitle the defendant to disclosure of every report or other document in existence that somehow relates to the case. *See* Rule 16(a)(2). The government has already made required disclosures through voluntary discovery and will continue to provide any discoverable materials in conformity with Rule 16 and in response to reasonable requests by the defendants.

### B.    Application

The government's delivery of the voluntary discovery materials renders the remaining discovery requests moot. As Rule 16 recognizes and mandates, pre-trial discovery is an on-going effort. Consistent with this obligation, as the government obtains or identifies any other evidence which falls within the scope of Rule 16, it will provide such evidence to defendants and their counsel. The government herein notifies the defendant that it intends to introduce all this evidence at trial pursuant to Rule 12(b)(4).

### i.    Statements

The government appreciates its ongoing responsibility to disclose any statements that fall within the ambit of Rule 16(a)(1)(A) or pursuant to the defendant's constitutional rights and will continue to disclose any and all relevant statements. *See* Fed R. Crim. P. 16(c). The government has satisfied its obligations under Rule 16(a)(1)(B) by making available for defense counsel's inspection relevant statements by the defendant. Pursuant to Rule 16(c), if the government becomes aware of any additional statements made by the defendants to law enforcement, any additional statements of the defendants falling within the purview of Rule 16

17

will be provided voluntarily.  "As to statements of trial witnesses, Rule 16 does not apply and the Jencks Act is the exclusive means for disclosure."  *United States v. Vasconcellos*, 658 F. Supp. 2d 366, 375 (N.D.N.Y. 2009) (citing *In re United States*, 834 F.2d 283, 286 (2d Cir.1987); *see also* FED. R. CRIM. P. 16 & 26.2)).

### ii.    Defendants' Prior Record

The government is aware that the defendant has received a copy of his criminal history records.

### iii.    Documents, Objects, Search and Seizure, and Identification

The government has complied with Rule 16(a)(1)(E) to produce and allow inspection of any documents and objects that the government would anticipate using in its case-in-chief at trial, is material to preparing a defense, or was obtained from the defendant.  The defendants have moved for disclosure of certain tangible objects, documents, and photographs.  The government believes it has provided voluntary discovery in compliance with Rule 16(a)(1)(E). Pursuant to Rule 16(a)(1)(E), the government has provided and made available, or will provide and make available, all photographs, papers, books, documents, tangible objects in the government's possession which the government intends to utilize at trial.  To the extent that additional items are identified or provided to the government, they will be provided voluntarily. *See* Rule 16(c).

### iv.    Additional Disclosure Requests

The defendant has made additional requests for disclosure of materials beyond the scope of Rule 16, and to which he is not entitled.  The defendant premises some of these requests on

the government's voluntary disclosure of materials from the *Lucas* case, out of the District of Utah.  The government received materials from the Utah case, *United States v. Lucas*, that included information bearing on the materiality of lies regarding criminal convictions on applications for disaster loans.  The government received the information and made the determination to disclose the information voluntarily to defendant.  The disclosure of the *Lucas* information included an offer by the government to answer any ensuing questions from counsel for the defendant, of which there have been none.  The government remains aware of its obligations and will continue to fulfill those obligations.

Defendant demands the immediate disclosure of "Jencks Material."  Defendant's request should be denied without prejudice to his ability to raise the request when the District Court promulgates a trial schedule.  The *Jencks* Act requires the government to produce any prior statements of a witness that relates to the subject matter of the witness's testimony and that are in the government's possession, *after* the direct examination of the witness.  *See* 18 U.S.C. § 3500.  As the defendant is surely aware, it is the trial court's practice to set a pretrial scheduling order.  Here, the defendant fails to make any showing for the extraordinary, expedited relief he seeks.  *See United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001).  Indeed, defendant fails to cite to any legal authority supporting his demand. Contrary to defendant's demand that this Court order the immediate disclosure of all *Jencks Act* material, the government notes that "a District Court's power to order pretrial disclosure is constrained by the *Jencks Act*."  *Id.*  Accordingly, the government intends to provide *Jencks* Act material consistent with the District Court's scheduling order.

Defendant demands, as discovery, various categories of 'Brady" information. Pursuant to *Brady* and its progeny, the government is under an affirmative duty to provide a defendant with exculpatory evidence, as well as evidence that the defense might use to impeach the government's witnesses at trial. *See Bagley*, 473 U.S. 667; *Giglio*, 405 U.S. 150. The government is fully aware of its obligations and responsibilities under *Brady* and acknowledges its continuing duty under *Brady* to produce such material.

However, *Brady* does not create a constitutional right of pretrial discovery in a criminal proceeding, and it does not require that the prosecution reveal before trial the names of witnesses. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *see also Lucas v. Regan*, 503 F.2d 1, 3 (2d Cir. 1974), cert. denied, 420 U.S. 939 (1975) ("Neither *Brady* nor any other case we know of requires that disclosures under *Brady* must be made before trial"); *United States v. Shaker*, 543 F. Supp. 1059, 1061 (S.D.N.Y. 1982) ("*Brady* does not entitle a defendant to a general right of pre-trial discovery."). The *Brady* doctrine does not cover many of the requests made by the defendant. For instance, evidence which is not exculpatory, but relevant for the purposes of impeachment, must be produced to the defense, but need not be turned over in advance of trial. *United States v. Nixon*, 418 U.S. 683, 701 (1974); *United States v. Coppa*, 267 F.3d 132, 145-46 (2d Cir. 2001).

*Brady* does not require the disclosure of evidence affecting the credibility of prosecution witnesses prior to such time as it would otherwise become available under the discovery rules or the *Jencks Act*. *See United States v. Dotel*, 1994 WL 25787, at *3 (S.D.N.Y. Jan. 21, 1994) (holding *Brady* impeachment material as to government's witnesses—i.e., *Giglio* material—is properly disclosed when the witness testifies at trial); *United States v. Feldman*, 731 F. Supp.

1189, 1200 (S.D.N.Y. 1990); *United States v. Victor Teicher & Co.*, 726 F. Supp. 1424, 1442–43 (S.D.N.Y. 1989).  Impeachment material is normally disclosed at the same time as *Jencks Act* material—after the government witness has testified on direct examination, or in accordance with the District Court's trial-related scheduling order.  *See* 18 U.S.C. § 3500(B); *Coppa*, 267 F.3d at 145–46.

### 3. <u>Motion To File Additional Motions</u>

The defendant has further moved for leave to make further and additional motions.  The defendant will be able to raise legal issues before trial to the extent the issues are not stale under Rule 12(b).  However, the defendant asks for blanket, open-ended permission to make any additional motion he may later choose to make whenever he chooses to make it.  As it stands, the defendant has already made numerous motions, each with multiple sub-categories, in his omnibus motions.  The Court should deny this motions, without prejudice.  *See* Fed. R. Crim. P. 12(b).  The law does not permit a defendant to hold in reserve any argument he chooses, for whatever reason he chooses, until a time that he chooses.  As such, the government objects to defendant's blanket reservation of motions and submits that any motion that could have, and should have, been filed by or before May 12, 2025, must be barred from being filed at a later date absent the defendant establishing good cause for the delay resulting from excusable neglect or actual prejudice arising from denial of the filing of any late motion.  Defendant's burden is heightened under the present circumstances, where the government provided initial discovery in July 2023, and the May 12, 2025, motion deadline was created by a series of defendant's requests for additional time.

**4. <u>Government's Cross-Demand for Reciprocal Discovery</u>**

Pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure, the government demands that the defendant provide the government the opportunity to inspect and copy or photograph books, papers, documents, photographs, tangible objects or copies or portions thereof which are within the possession, custody or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial.

In addition, the government also demands that the defendant permit the government to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case or copies thereof within the possession or control of the defendant which the defendant intends to introduce as evidence in chief at trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness's testimony.

Finally, the government will demand, upon the District Court's setting a trial date and accompanying Scheduling Order, that the defendant provide a summary of any testimony that the defendant intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence at trial.

DATED:  Buffalo, New York, June 2, 2025.

MICHAEL DIGIACOMO
United States Attorney

BY:     s/EVAN K. GLABERSON
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716/843-5871
Evan.Glaberson@usdoj.gov